**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| UNOWEB VIRTUAL, LLC, | |
| *Plaintiff,* | |
| v. | Civil Action No._____ |
| ALLIANCE DATA SYSTEMS CORPORATION, | |
| *Defendant.* | **JURY TRIAL DEMANDED** |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff UnoWeb Virtual, LLC ("UnoWeb" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos. 7,941,345 ("the '345 patent"); 8,065,386 ("the '386 patent"); 7,987,139 ("the '139 patent"); and 8,140,384 ("the '384 patent") (collectively, the "patents-in-suit" or the "UnoWeb Patents"). Defendant Alliance Data Systems Corporation ("Alliance Data" or "Defendant") infringes the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

### INTRODUCTION

1. In an effort to expand its product base and profit from the sale of specific e-commerce outsourcing systems, including methods of advertising and content distribution that, prior to the development of the UnoWeb Patents, were unknown and never employed on the internet before, Alliance Data has undertaken to copy the technologies disclosed in the UnoWeb Patents.

2. John Almeida is the inventor of the '345, '386, '139, and '384 patents.[1]  Mr.

---

[1] John Almeida is the inventor and owner of 14 issued U.S. patents, 38 published U.S. patent applications, and numerous pending unpublished patent applications before the United States Patent and Trademark Office ("USPTO").

Almeida developed the technologies at issue in this case in response to his exposure to the unique problems that retailers and advertisers faced based on the specific architecture of the internet.

3.      UnoWeb is an operating company based in Plano, Texas, which provides platforms for e-commerce, internet advertising, and content management.  UnoWeb's products include UnoWeb AdMind, UnoWeb WayVi, and UnoWeb OpenCommerce.  UnoWeb's groundbreaking technologies are available at www.unoweb.com and www.unowebdemo.com.

4.      Mr. Almeida is the owner of UnoWeb and a resident of Plano, Texas.  Mr. Almeida sought patent protection for his inventions.  A software developer who moved to the United States from Brazil, Mr. Almeida worked on e-commerce applications in the first wave of internet businesses in the mid-1990s.  Mr. Almeida worked for TradeYard.com[2] and Roidirect.com.[3]  These early internet companies exposed Mr. Almeida to problems that were unique to content distribution and advertising on the internet.[4]  Problems such as internet server resource allocation, third-party content integration on the World Wide Web, internet advertising click-fraud, and internet affiliate advertising were unique problems arising from the context of content distribution over a computer network and internet based advertising.

5.      The internet created the wholly new challenge of compensating internet content providers based on contextual advertising from a third party.  Mr. Almeida recognized the

---

[2] *See* Colleen Benson, *People in Business*, SAN FRANCISCO CHRONICLE (May 8, 2000) (Describing TradeYard as an "Internet marketplace for used heavy equipment."  Although common today TradeYard was introducing the novel idea of providing an internet distribution venue to regional brick and mortar stores); *see also Micro General Affiliate Escrow.com Announces Integration of Fully Functional Transaction Settlement Engine by B2B Exchanges*, Micro General Corporation Press Release (December 5, 2000).

[3] *See* Merrill Warkentin, BUSINESS TO BUSINESS ELECTRONIC COMMERCE: CHALLENGES AND SOLUTIONS AT 267 (2002) (Describing the ROIDIRECT.com solution as "such companies provide eServices such as payment processing, logistics, and site monitoring.  Some vendors that provide such services are bccentral.com (from Microsoft.com), Webvision.com, Roidirect.com, dellworks.com, and Websphere from ibm.com.").

[4] *See e.g.*, U.S. Patent App. 2003/0120560, *Method For Creating and Maintaining WorldWide E-Commerce* (Filed December 20, 2001) ("At present, there are needs for easy and affordable worldwide e-commerce solutions where the seller can have their goods and services sold.").

drawbacks in the state of the art at the time, and through his ingenuity and work, Mr. Almeida developed a variety of systems directed at problems unique to advertising and content distribution on the internet.  For example, in 2001, Mr. Almeida filed a patent application that discussed the problems faced by "e-shops" such as Amazon.com, Inc.  These problems included the failure of existing prior art e-commerce platforms to enable the distribution of content, advertising, and product listings from third parties.  Integration of third party content was lacking in prior art systems.  "[A] buyer will have to move from e-shop to e-shop in the e-mall.  Time is thus wasted and sales can be lost.  Furthermore, the dynamic e-mall concept cannot be created without an elaborate and expensive e-commerce infrastructure."[5]

6.     Websites have adopted Mr. Almeida's inventions without his consent.  The patents-in-suit and their underlying patent applications have been cited by over 200 issued United States patents and published patent applications.[6]

7.     In developing UnoWeb, Mr. Almeida developed inventions directed to web content management.  These inventions led to five patents that disclose systems and methods for distributing and managing access to data where data is stored in multiple external servers or independent content hosts in the same server location.  These web content management patents address the difficult problem of managing access to data supplied by third parties.

8.     The following diagram shows the UnoWeb Web Content Management patent family tree, pending patent applications, and UnoWeb Web Content Management patents Alliance Data infringes.

---

[5] U.S. Patent App. 10/029,073 (filed December 20, 2001).

[6] *See e.g.*, U.S. Patent Nos. 9,092,792 (assigned to eBay, Inc.), 8,356,277 (assigned to Adobe Systems, Inc.), 8,560,955 (assigned to AT&T, Intellectual Property L.P.), 8,370,370 (assigned to International Business Machines Corp.), 9,210,202 (assigned to Qualcomm, Inc.), 8,832,059 (assigned to CBS Interactive, Inc.), 8,688,669 (assigned to Google, Inc.), 8,874,639 (assigned to Facebook, Inc.), 8,589,292 (assigned to Hewlett-Packard Company L.P.), 9,235,861 (assigned to Apple, Inc.), 8,639,817 (assigned to Amazon Technologies, Inc.), 8,700,609 (assigned to Yahoo!, Inc.), 9,196,000 (assigned to Xerox Corporation), 8,370,948 (assigned to Websense, Inc.), 8,938,073 (assigned to Sony Corporation), 9,253,177 (assigned to Panasonic Intellectual Property Management Co., Ltd.), 9,015,842 (assigned to Raytheon Company), 7,124,093 (assigned to Ricoh Co., Ltd.).



9.     Mr. Almeida's UnoWeb web system, lead to the development of additional technologies relating to managing internet advertising,[7] preventing click fraud,[8] filtering undesired electronic messages,[9] symmetric and asymmetric encryption,[10] and global resource sharing between web servers.[11]  The following diagram shows the UnoWeb patents that relate to

---

[7] *See e.g.*, U.S. Patent No. 7,987,139, col. 1:22-26 ("Currently, content writers write content that are integrated onto a blog-portal, virtual community and others, the content writer does all the intellectual work and the hosting environment inserts advertisings and other paid content along the user-provided content without compensating the intellectual-proprietor whatsoever.").

[8] *See e.g.* U.S. Patent No. 7,580,858, col. 5:5-7 (Referring to the challenges posed by the internet "as never before possible and offering a tremendous potential for the content provider, content host, content distributor and clicker.").

[9] *See e.g.*, U.S. Patent No. 8,280,967, col. 10:14-16 ("the invention may be used to stop spammers and to save resources that would otherwise be wasted on spam").

[10] *See e.g.*, U.S. Patent No. 8,811,606, col. 3:53-56 ("Existing encryption techniques fails to teach a secure means where values other than prime numbers can be used in cryptographic process.").

[11] *See e.g.*, John Almeida, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS MODEL (describing the technologies of the UnoWeb web application); *Instructions on Using UnoWeb OpenCommerce*, UNOWEB OPENCOMMERCE DOCUMENTATION (2002); U.S. Patent No. 7,971,198, col. 1:16-17 (Describing the inventions disclosed as including "sharing of page-

these technologies, including a pending patent application, and the patents Alliance Data infringes.



## UNOWEB'S LANDMARK WEB CONTENT MANAGEMENT SYSTEMS

10.     Mr. Almeida founded UnoWeb in 2001 in response to a need for systems and methods that would allow an e-commerce system to manage data supplied by third parties (*e.g.*, remote servers communicating over the internet).  One of Mr. Almeida's insights was that manufacturers and distributors of goods needed a simple way to make goods and content available to a broad audience of users.  "Today's e-commerce requires solutions where seller can have their products/services available to a broad base of buyers, also, virtually available to other e-shops, satellite e-malls and e-malls where they will be offered to a broader clientele base."[12]

11.     Mr. Almeida created UnoWeb's OpenCommerce system.  UnoWeb OpenCommerce enabled providers and distributors of content to make products available over a shared infrastructure, "offering solutions with a single e-commerce infrastructure at one location.

---

source code and settings parameters that can be logically linked at the global resource sharing level.").

[12] U.S. Patent App. 10/029,073 at ¶ 10.

All the required solutions are available to every OpenCommerce Provider, OpenCommerce
Stores, OpenCommerce Distributor, OpenCommerce Manufactures, and E-Services within the
virtual OpenCommerce Network."[13]



John Almeida, *UnoWeb OpenCommerce Architecture*, UNOWEB OPENCOMMERCE WORLDWIDE
SOLUTIONS BUSINESS PLAN (2002).

12.     UnoWeb's solutions overcome problems unique to the internet and inherent in the
state of the art at the time.  "At the present, there are needs for easy and affordable worldwide e-
commerce solutions where seller can have their goods and services sold without the expertise or
the expenses that today's e-commerce requires."[14]  Existing e-commerce web sites required
providers of content to update services and products directly on [a specific and predetermined] e-
commerce platform.[15]

---

[13] John Almeida, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS MODEL at 2
(2002).

[14] U.S. Patent App. 10/029,073 at ¶ 4.

[15] *See e.g.*. U.S. Patent No. 6,901,378 (this patent was cited on the face of UnoWeb U.S. Patent
App. 10/029,073 and describes limitations in existing systems contemporaneous to Mr.
Almeida's inventions as "none of the prior art methods have provided for associating
information with an image that indicated which products were available for that particular image.
Typically, different types of products were separately displayed and only after a user chose a
particular type of product."); *see also* U.S. Patent No. 5,745,681 (this patent assigned to Sun
Microsystems and cited on the face of UnoWeb's U.S. Patent App. 10/029/017 and published in
April 1998 described limitations in the prior art as including "[t]here is currently no reliable

> **INSTRUCTIONS IN USING *OpenCommerce*™**
>
> These are the instructions need to know *OpenCommerce*™ and it involves Patent Pending Business Model an all of its associated technologies.
>
> If at any time the language displayed is not English select it from the drop-down. Only 2 languages have been implemented at this point (Portuguese/English - Portugês/Inglês). There support for 6 language but I don't write well in some and not at all in others. If you switch to any other language besides English and Portuguese nothing will appear on the screen or just garbage (I entered garbage for testing). The official release will be translated to all supported languages. Please let Sergey know that in the future *OpenCommerce*™ will support Russian.

*Instructions on Using UnoWeb OpenCommerce*, UNOWEB OPENCOMMERCE DOCUMENTATION at 1 (2002) (user guide for using UnoWeb's OpenCommerce system).

13.     Patent Applications from leading technology companies identified the inability of e-commerce websites to aggregate content from a variety of sources.  For example, a 2001 International Business Machines patent application (cited in the prosecution history of the patents-in-suit) identified the inability of web sites to gather content from third parties.

> Furthermore, while the foregoing e-shopping model could provide a combined search result and an incentive for purchasing items from multiple vendors, this purpose is practically defeated because the foregoing e-shopping model does not facilitate the shopping experience. . . . Accordingly, the foregoing e-shopping model, which is representative of current e-shopping services, ***does not adequately address the shoppers' need for an intuitive interface with the vendors' sites to complete numerous purchases from heterogeneous vendors***.[16]

U.S. Patent App. 09/780,636 (filed February 10, 2001 and assigned to IBM) (emphasis added).

14.     Existing systems for e-commerce offered providers the ability to create separate e-shops but required that providers use the same platform and commonly the same server.

---

means to deduce the user's account information from the information accompanying a random request for a page.").

[16] *See also* U.S. Patent No. 6,907,401 (Cited on the face of the patents-in-suit, this patent identified limitations in the state of the art including, efficiently aggregating content from heterogeneous sources.  "[A]dditional effort and time may be involved in signing a merchant up for service and manually or periodically updating the merchant's listing."); U.S. Patent No. 7,249,056 ("Therefore, the affiliate sites need to receive and store the most current product (or service) data from a variety of merchants, each of which may make independent decision about how to store and transmit data internally.").

Limitations in existing systems severely restricted the ability to scale the aggregation of content and were difficult to implement.  The below figure from a 2002 Overview of the UnoWeb OpenCommerce system shows one of the problems with existing systems where e-shops were either required to be hosted on the same platform or were connected via e-mail.



John Almeida, *UnoWeb OpenCommerce Architecture*, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS PLAN at 3 (2002).

15.    UnoWeb's OpenCommerce system enabled the transmission of data by content providers using a shared infrastructure.  Further, as outlined in a 2001 document from UnoWeb, the use of a virtual network resource infrastructure allows the exchange of content from remote servers without the need for the providers of content to directly update content or handle the creation of e-commerce infrastructure tasks such as "e-commerce web site hosting, credit card gateway, [and] logistics."[17]

---

[17] John Almeida, UNOWEB OPENCOMMERCE OVERVIEW PRESENTATION at 10 (2001).



John Almeida, UNOWEB WORLDWIDE OPENCOMMERCE PLATFORM at 23 (July 2001).

16.     John Almeida filed U.S. Patent App. 10/029,073 in December 2001, which disclosed inventions relating to the UnoWeb system.  The patent application described a system where "Requests are sent and data received from different servers in the network or over the Internet.  And they are requests for database objects (table rows) from each server.  Once they're received, they are combined and a single dynamic table is formed, then it is related with the virtual table 1502 (ID column) at virtual server 1500."[18]

---

[18] U.S. Patent App. 10/029,073 at ¶ 138.



John Almeida, *UnoWeb OpenCommerce Architecture*, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS PLAN (2002) (describing the architecture of the UnoWeb OpenCommerce system).

      17.     UnoWeb developed a variety of technologies that have been widely adopted by leading internet companies.  These UnoWeb systems are available at www.unoweb.com and www.unowebdemo.com.  The UnoWeb inventions included the development of a social networking platform that allowed the aggregation of content from a variety of sources.  For example, UnoWeb's WayVi system is a Social Network for individuals and businesses that enables the consolidation of third party content on a single webpage.  UnoWeb WayVi enables the aggregation of images, photos, blogs, shopping carts, and connection information on one page that is displayed to a user.  The below screenshot shows the ability of the UnoWeb WayVi system to retrieve data from a variety of sources for display on a single webpage.



*UnoWeb WayVi Webpages*, UNOWEBDEMO.COM WEBSITE (showing the aggregation of content including (1) photo albums (2) blog entries (3) applications and (4) user connections).

18.     Mr. Almeida recognized that the growing adoption of the internet and the increasingly distributed nature of content on remote web servers presented unique challenges to making relevant content accessible to users.  Mr. Almeida also had the insight that the challenges presented in controlling access to third party content could be applied outside the context of e-commerce, with wide applicability to internet advertising where a third party could take advantage of the internet to provide relevant contextual advertising.  To address the need for third parties to utilize contextual advertising, UnoWeb developed AdMind and integrated AdMind into UnoWeb's WayVi System.  UnoWeb WayVi is UnoWeb's social networking application.  The below screenshot shows how advertisements from third parties are linked to relevant content using the UnoWeb platform.



*UnoWeb AdMind System*, UNOWEB.COM WEBSITE (Showing the UnoWeb AdMind system that enable advertisers to place contextual advertisements.  This screenshot also shows how the UnoWeb system enables users to be charged for their context based advertising.).

19.    UnoWeb AdMind enables advertisers to purchase advertising that is displayed with contextually relevant content supplied by third parties.  The below screenshot from the UnoWeb system shows how advertising is associated to third party supplied content furnished by content providers.  UnoWeb provides a mechanism for associating advertising with relevant content.[19]

---

[19] At the time the inventions disclosed in the patents-in-suit were conceived the ability to provide contextual advertising was described by major technology companies as directly relating to the unique nature of providing relevant advertising on the internet.  See e.g., U.S. Patent No. 8,700,609 (this patent which references the UnoWeb patents and was assigned to Yahoo!, Inc. states "[t]he present invention relates to online communities, and more particularly to advertising in an online community.  The Internet has become a major platform for exchanging goods and information, and has been used for, e.g., online shopping, online auction, photo album sharing and social networking."); *see also* U.S. Patent No. 8,380,576 (This patent assigned to Microsoft Corporation and citing the UnoWeb patents describes the challenges of allocating revenue between paid and non-paid content in the context of the internet.  "While cooperation of these different entities in creating and maintaining the mobile marketplace can provide a tremendous marketing and purchasing resource, allocating revenue resulting from mobile marketplace transactions can be challenging.").



*UnoWeb AdMind Associated Content*, UNOWEB.COM WEBSITE (showing the association of AdMind advertising with third party content).

     20.     UnoWeb's AdMind system overcame a problem unique to the internet by allowing third party content to be associated with paid advertising and enabled content providers to be compensated for provisioning content relevant to associated relevant advertising.[20]

---

[20] Relating paid content (*e.g.*, advertising) with unpaid content (*e.g.* a content provider such as a blogger) was a problem that arose from and was unique to the architecture of the internet. Efficiently relating paid and unpaid content over a computer network has been recognized by companies such as IBM and Yahoo as being specific to the internet.  *See e.g.,* U.S. Patent App. 12/826,924 (This patent application (assigned to IBM) cites the UnoWeb patents in its prosecution history and states "[i]n addition, it is difficult for advertisers to determine where to best place advertisements, since content is diffusely spread over the Internet.  A need therefore exists for methods and apparatus for dynamic placement, management and monitoring of blog advertising."); U.S. Patent No. 9,196,000 (This patent assigned to Yahoo likewise identifies the unique challenges created by the internet "dynamic digital solutions or products create issues with respect to collection of fees and the distribution of such fees to the appropriate entities because conventionally, the conventional form of payment for digital content and/or services has been a single payment mechanism.").



*UnoWeb AdMind Administration Screens*, UNOWEB.COM WEBSITE (showing the signup process for UnoWeb AdMind).

21.     UnoWeb's AdMind also developed the use of keyword-based associations between advertisements and third party created content.  For example, during the signup process for AdMind, an advertiser can associate an advertisement with various key words.  These keywords are subsequently used to associate content with advertisements that are displayed to users.



*AdMind by UnoWeb*, UNOWEBDEMO.COM WEBSITE (this screen shot shows how the UnoWeb system enables the inputting of key words that are used to match advertising content from third parties to content providers).

22.     UnoWeb's patents and published patent applications have been cited in over 200 United States patents and published patent applications as prior art before the United States Patent and Trademark Office.[21]   Companies whose patents and patent applications cite the UnoWeb patents include:

- Demandware, Inc.
- eBay, Inc.
- Amazon.com, Inc.
- Adobe Systems, Inc.
- Microsoft Corporation
- International Business Machines Corporation
- Xerox Corporation
- AT&T Corporation
- Yahoo!, Inc.
- Facebook, Inc.
- Hewlett- Packard Development Company, L.P.
- Raytheon Company
- CBS Interactive, Inc.
- Apple, Inc.
- Symantec Corporation
- Websense, Inc.
- Sony Corporation
- Panasonic Corporation
- Netapp, Inc.
- Google, Inc.
- Qualcomm, Inc.
- Alibaba Group Holding Limited
- Ericsson Television, Inc.

### THE PARTIES

### UNOWEB VIRTUAL, LLC

23.     Plano, Texas based UnoWeb provides information management solutions that allow companies and individuals to manage internet content, provide contextual internet advertising, and conduct internet based social networking services.

---

[21] The 200 forward citations to the UnoWeb Patents do not include patent applications that were abandoned prior to publication in the face of the UnoWeb Patents.

24.     John Almeida, the inventor of the patents-in-suit and owner of UnoWeb, resides in the Eastern District of Texas.

25.     UnoWeb is committed to advancing the current state of internet content management and internet advertising solutions.  UnoWeb's principal place of business is located in the Eastern District of Texas at 5761 Robbie Road, # 3403, Plano, Texas 75024.

26.     One of UnoWeb's core markets is internet web-advertising solutions, which refers to a variety of solutions for managing online advertising.  One such solution, UnoWeb AdMind provides a platform for managing paid content (*e.g.*, advertisements), matching paid content to relevant unpaid content (*e.g.*, publisher provided content), and handling revenue sharing between the paid and unpaid content.

27.     UnoWeb is a small, Texas based company.  UnoWeb depends on patent protection to effectively license its innovative technologies and sell its UnoWeb systems.  Like Defendant Alliance Data, UnoWeb relies on its intellectual property for its financial viability.

> We rely on a combination of copyright, trade secret and trademark laws, confidentiality procedures, contractual provisions and other similar measures to protect our proprietary information and technology used in each segment of our business.  In the United States, we have 10 issued patents, 23 pending patent applications, and 24 pending provisional patent applications, each with the U.S. Patent and Trademark Office.[22]

28.     Defendant's sale and distribution of products and services that infringe the patents-in-suit has caused and continues to cause UnoWeb irreparable harm.

29.     As a result of Alliance Data's unlawful competition in the Eastern District of Texas and elsewhere in the United States, UnoWeb has lost sales and profits and suffered irreparable harm, including lost market share and goodwill.

---

[22] ALLIANCE DATA SYSTEMS CORPORATION FORM 10-K at 7 (2014); *see also Id.* at 17 ("Litigation may be necessary to enforce our intellectual property rights, protect our trade secrets or determine the validity and scope of the proprietary rights of others.").

**ALLIANCE DATA SYSTEMS CORPORATION**

30.     Alliance Data Systems Corporation is a Delaware Corporation with its principal place of business at 7500 Dallas Parkway, Suite 700, Plano, Texas 75024.  Alliance Data is registered to do business in the State of Texas and it may be served with process by delivering a summons and a true and correct copy of this complaint to its registered agent for receipt of service of process, the Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

31.     On information and belief, Alliance Data has offices in Texas where it sells, develops, and/or markets its products, including:

- Alliance Data Systems Corporation corporate headquarters are located in Plano, Texas.[23]
- Alliance Data owns and/or leases 330,000 square feet of office space located in Plano, Irving, and Lewisville, Texas.[24]
- Alliance Data operates datacenters and/or severs relating to the infringing products in Texas and specifically the Eastern District of Texas.
- Alliance Data subsidiaries such as Epsilon have admitted that they do business in this judicial district and consented to jurisdiction in the Eastern District of Texas.[25]

32.     Alliance Data provides web-advertising solutions in the form of its CJ Affiliate advertising system.

33.     Alliance Data's customers infringe the patents-in-suit by using products that infringe the patens-in-suit include the CJ Affiliate product.  Further, Alliance Data encourages customers to use infringing software at least by making its content-sharing services available on

---

[23] ALLIANCE DATA SYSTEMS CORPORATION ANNUAL REPORT at 2 (2014) ("Our corporate headquarters are located at 7500 Dallas Parkway, Suite 700, Plano, Texas 75024.").

[24] *Id*. at 23 (identifying 108,269 square feet of office space in Plano, Texas; 221,898 square feet of office space in Irving, Texas; and 10,000 square feet of office space in Lewisville, Texas).

[25] *RPost Holdings, Inc. et al v. Epsilon Data Management, LLC*, Case. No. 12-cv-511 Dkt. No. 32 at ¶ 4 (September 20, 2013) ("Epsilon admits that it conducts business in this district.  Epsilon admits that venue in this district is proper under 28 U.S.C. §§ 1391(b)–(d) and that venue in this district is proper under 28 U.S.C. § 1400(b), but only insofar as RPost purports to bring an action for patent infringement and only insofar as Epsilon resides and/or "has a regular and established place of business" in this district.").

its website, widely advertising those services, providing applications that allow users to access those services, and providing technical support to users.

34.     Alliance Data competes directly with UnoWeb in the web advertising market by offering for sale and selling the infringing Alliance Data advertising solutions.

35.     Because Alliance Data actively targets customers in the Eastern District of Texas, Alliance Data's infringement adversely affects UnoWeb and UnoWeb employees who live and work in the Eastern District of Texas (*e.g.*, UnoWeb's founder and owner John Almeida).

## JURISDICTION AND VENUE

36.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

37.     Upon information and belief, this Court has personal jurisdiction over Alliance Data in this action because Alliance Data has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Alliance Data would not offend traditional notions of fair play and substantial justice.  Defendant Alliance Data, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit.  Moreover, Alliance Data is registered to do business in the State of Texas.

38.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b). Defendant Alliance Data is registered to do business in Texas, has its principal place of business in Texas, and upon information and belief, has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

39.     Advances in computational power and the explosive growth of the internet have led to the development of web content management and advertising systems that aggregate data

from third party servers on a network and enable the provisioning of advertising content so the paid advertising content is contextually relevant to users.

- **The UnoWeb Web Content Management patents** teach specific computer based web content management systems, including systems that use a virtual network resource infrastructure for hosting and managing heterogeneous data from third party providers.
- **The UnoWeb Internet Advertising patents** teach specific computer based web content management systems, including systems that enable revenue sharing between all parties that are involved in the process of interacting with paid content and helping generate revenues.

## WEB CONTENT MANAGEMENT PATENTS

40.    Alliance Data prizes systems that manage the integration of heterogeneous data from third parties including servers containing data that is aggregated for display to users over the internet.  Andy Frawley, chief executive officer of Alliance Data subsidiary Epsilon, stated:

> To enable the strongest possible brand experience for a consumer, it is imperative to leverage the power and value of data to drive marketing, advertising and programming to better connect the consumer's experience and engagement.  We look forward to leveraging our full suite of Big Data capabilities to support the Turner Data Cloud.[26]

41.    Alliance Data has identified the ability to integrate content from third parties as "powerful" and providing a "high value add."

> The acquisition of Conversant establishes *a truly unique end-to-end marketing services company that will empower clients* to more effectively market to their customers across all channels. . . The acquisition of Conversant is highly complementary to this focus.  It provides not only enhanced online, anonymous and unstructured data, but also cross-device (desktop, tablet, mobile) and cross-channel technology through Conversant's Common ID initiative.[27]

42.    Alliance Data's competitors such as AOL.com have confirmed the importance and value of content aggregation systems that enable the integration of third-party data over the internet.

---

[26] *Turner Broadcasting Partners With Epsilon To Launch Turner Data Cloud*, ALLIANCE DATA PRESS RELEASE (June 30, 2015).

[27] *Alliance Data to Acquire Ad Tech Leader Conversant for Approximately $2.3 Billion*, ALLIANCE DATA PRESS RELEASE (September 11, 2014) (emphasis added).

The company has a two-fronted approach to its business, delivering content in order to build a user base, and offering advertising services for agencies and direct customers looking to connect with those consumers.  "We think at the fore about content, aggregation of audience, and making sure that it's multi-screen.  And so we are endeavoring to ensure that that content is digestible, it's relevant, it's easy, and it's working," Moysey said.[28]

43.    Patents that have cited the UnoWeb Patents as relevant prior art have similarly identified the unique challenges presented by internet content where the content comes from third-parties presents challenges unique to the internet.  For example, U.S. Patent No. 9,141,713, assigned to Amazon.com, identified content that is aggregated from third parties presents challenges in identifying and displaying relevant content for users.  "However, determining the relevancy of a particular web page to a keyword search is an inherently difficult task.  If a web page does not happen to use the same terms that a user might include in a search for that web page."[29]

44.    Although content aggregation systems that enable a web content management system to access data stored on a third party server are offered by major corporations today, at the time the inventions disclosed in the UnoWeb Web Content Management patents were conceived, no comparable systems existed.

45.    The claims in the UnoWeb Web Content Management patents describe a solution that is unquestionably rooted in computer technology to overcome a problem specific to and characteristic of complex computer networks.  A 1999 patent assigned to Yahoo.com!, Inc. (cited on the face of UnoWeb Patent App. No. 10/029,073), described the drawbacks inherent in existing systems for making content available from third-parties:

> For example, *a merchant participating in a virtual shopping mall or local commerce site typically had to establish and had to maintain two separate websites*: (1) one website, the merchant's "mall website," for consumers who were shopping for the merchant's goods through the virtual shopping mall or local commerce site and (2) another website, the merchant's "direct website," for

---

[28] *AOL Seeing Breakneck Adoption of Content on Mobile*, MOBILE WORLD LIVE, available at: http://www.mobileworldlive.com/featured-content/top-three/aol-seeing-breakneck-adoption-content-mobile-exec/ (April 13, 2015).

[29] U.S. Patent No. 9, 141,713 (filed December 30, 2005).

consumers who were shopping for the merchant's goods not through the virtual shopping mall or local commerce site, but rather directly through the merchant's own website.[30]

46.     Although content aggregation, in some form, has been an objective of individuals for many years, the UnoWeb Web Content Management patents are directed at solving problems that are unique to the realm of internet content management.

47.     On information and belief, contemporaneous to, and following conception of the inventions disclosed in the UnoWeb Web Content Management patents, academics, and businesses headquartered in Texas actively entered the field of internet content management.[31]

48.     University of Texas at Austin Stan Richards School of Advertising & Public Relations Moody College of Communication created the founded the TexasMedia program focused on the digital media environment.[32]  The University of Texas at Dallas founded the Institute of Data Analytics, a center for research on data analysis, which collaborates with private industry.  Baylor University in Waco, Texas is the home of the Electronic Commerce Center, which focuses on integrating technology and electronic data with e-commerce.

### 1.  U.S. Patent No. 7,941,345

49.     U.S. Patent No. 7,941,345 ("the '345 patent") entitled, *Method of Presenting Contents Based on a Common Relationship*, was filed on October 31, 2007, and claims priority to December 20, 2001.  UnoWeb is the owner by assignment of the '345 patent.  A true and

---

[30] U.S. Patent No. 6,499,052 (filed August 11, 1999) (emphasis added).

[31] *See e.g*., Forcepoint L.L.C. (previously known as Websense, Inc.) is based in Austin, Texas and develops content management systems such as the TRITON APX Suite.  Patents assigned to Forcepoint which cite the UnoWeb patents as relevant prior art include: U.S. Patent Nos. 9,130,972, 8,938,773, 9015,842, 8,407,784, 9,130,986, 8,959,634, and 8,370,948; *see also* Hewlett-Packard Development Company, L.P. ("HPDC") based in Houston, Texas provides information technology solutions.  Patent and patent applications assigned to HPDC which cite the UnoWeb patents as relevant prior art include U.S. Patent No. 8,589,292 and U.S. Patent App. 13/791,911.

[32] *Interactive Advertising Bureau*, PREPARING THE NEXT GENERATION FOR INTERACTIVE Advertising Careers at 5 (July 2013), available at: http://www.iab.net/media/file/IABEducationResearch2013.pdf ("With the strength of the Advertising program and the ability to incorporate business and digital media courses, UT-Austin has in the best situation to develop an interactive advertising program.").

correct copy of the '345 patent is attached hereto as Exhibit A.  The '345 patent claims specific methods for retrieving the third-party-supplied content comprising first objects describing a product or service, wherein retrieving is from a third-party-hosting server, said retrieving is performed by the server computer.

50.     The '345 patent claims a technical solution to a problem unique to computer networks – easy and affordable worldwide e-commerce solutions where a seller can have its goods and services sold without the expertise or the expenses that today's e-commerce solutions require.

51.     The '345 patent addressed a problem faced by web site owners who had a need for providing first content and associated second content to a user of a client computer system. The provider's server receives a request from the client computer system to send a first object in an HTML page for display on the client computer system.  The provider examines the requested first object and includes a related second object in the HTML page.  Like claims that have been found constitute patent eligible subject matter, the inventions of the '345 patent are directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant.[33]

52.     The '345 patent is directed at generating specific data structures.[34]  The generating of data structures includes the generating of a web page that includes the second content.

---

[33] *DDR Holdings v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014) (Invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant was eligible for patenting because the invention addressed an important challenge (*i.e.*, retaining website visitors through the use of computer technology).); *KlausTech, Inc. v. Admob, Inc.*, Case. No. 10-cv-05899 Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (Upholding the validity of an internet advertising patent that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm."); *Mirror World Techs. LLC v. Apple Inc., et al.*, Case No. 13-cv-419 Dkt. No. 346 at 18 (E.D. Tex. July 7, 2015) (Upholding the patent eligibility of claims where "the invention is a method whereby a computer system organizes every data unit that it receives or generates chronologically with time stamps.").

[34] *Advanced Marketing Sys., LLC v. CVS Pharmacy, Inc.*, Case No. 15-cv-00134 Dkt. No. 77 at 10 (E.D. Tex. Nov. 19, 2015) (Order Adopted at Dkt. No. 95 January 25, 2016) (Denying

53.     The '345 patent discloses methods to prevent visitors from being lured away by third-party merchants.  The methods disclose a system to retain web site visitors by processing data from third-party servers.  "[T]hey will have a broad selection without having to go to many different e-shops to find what they're looking for, and also be able to view web pages in their own native language."  '345 patent, col. 1:66-2:2.  Instead of transporting a web site visitor away from an owner's site, a user is displayed related content from the third-party merchant, "e-services/contents can be retrieved from different server by another server (secondary server) and this secondary server will make any or all of these e-services available to one or more servers (tertiary servers) and each of the tertiary servers will make these e-services available to a client."  *Id.*, col. 20:58-62.  This allows the host web site to display the third-party merchant's product while still retaining its visitor traffic.

54.     The '345 patent discloses methods that are directed to challenges particular to the internet (i.e., retaining web site visitors).  The patent's claims did not merely address the performance of a business practice known from the pre-Internet world and require it to be performed on the Internet.  Instead, the claimed solutions are necessarily rooted in computer technology and are directed to overcoming a problem specifically arising in the realm of computer networks.

55.     Microsoft Corporation in a 2009 patent application that cites the '345 patent as relevant prior art describes the internet as "disruptive technologies" that create unique problems arising from the internet displaying content in two-dimensional space.

> [I]mages and inventory are represented in a two-dimensional manner, which *does not allow a user to fully examine merchandise.  Since a two-dimensional interface is presented to the user,* there can be a learning curve associated with navigating a shopping Internet page since the two-dimensional interface likely differs greatly from an actual brick-and-mortar store.  Thus, a shopper is not able to appreciate the goods fully, is limited in an ability to view merchandise, and can lose aspects experienced during traditional shopping.[35]

without prejudice Defendants' motion to dismiss patents directed to discount coupons: "The presence of these structures counsels away from summarily concluding that the asserted claims are directed to an abstract idea.").

[35] U.S. Patent App. 12/406,903 at ¶ 4 (emphasis added).

56.     At the time of the inventions claimed in the '345 patent, processing, transmitting, and aggregating third party electronic data in a distributed computing environment presented new and unique issues over the state of the art.  As explained in the '345 patent: "products/services cannot be shared among other e-malls or e-shops even within their own network of dynamic e-shops at the e-mall." '345 patent, col. 1:43-45.[36]

57.     Although the methods taught in the '345 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '345 patent claims were innovative and novel.  "Currently, dynamic e-mall will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops." '345 patent, col. 1:55-57.

58.     Further, the '345 patent claims improve upon the functioning of a computer system by allowing the aggregation of third party supplied data.  This improves the security of the computer system and allows it to be more efficient.[37]

59.     The '345 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods for retrieving the third-party-supplied content comprising first objects describing a product or service, wherein retrieving is from a third-party-hosting server, said retrieving is performed by the server computer.

60.     The '345 patent claims are not directed at the broad concept/idea of "content management."  Instead, they are limited to a concretely circumscribed set of methods for

---

[36] *See also* U.S. Patent App. 09/947,866 at ¶ 7 (This patent application, assigned to IBM, filed September 6, 2001 and cited on the face of the '345 patent discusses limitations in existing systems "[i]n addition, when retrieving web content from numerous different locations, searching, mining, analyzing, and/or archiving the web content can be a time consuming task.).

[37] *See e.g., Gonzalez v. InfoStream Group. Inc.*. Case. No. 2-14-cv-00906, Dkt. No. 160 at 7 (E.D. Tex. Feb. 6, 2016) (Finding claims that recite steps for "'gathering' one type of data and 'producing' a 'label.'  'Gathering' data may describe an abstract idea, but 'producing' a 'label' based on that data does not describe an abstract idea.").

retrieving the third-party-supplied content comprising first objects describing a product or service, wherein retrieving is from a third-party-hosting server.  These methods are technologies unique to the internet age.  Intel in U.S. Patent No. 6,070,176 (cited on the face of the '345 patent), identified problems unique to internet based systems for data retrieval.

> Web technology still has numerous shortcomings. . . Web documents commonly reference other Web documents using hypertext links. . . . With Web technology of the prior art, the user generally receives no explicit information regarding the relationships between Web documents. . . . One problem with this method of displaying search results is that documents with little or no relevance to the user's objective are often retrieved in a search.[38]

61.     The inventive concepts claimed in the '345 patent are technological, not "entrepreneurial."  For example, retrieving content from a third-party hosted server is a specific, concrete solution to the technological problem of transferring information from a third party for display on a webpage.

62.     The '345 patent claims require the use of a "guiding means" for use in identifying third party content.[39]

63.     The '345 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of web content management.  For example, claims of the '345 patent require hosting on the server computer said third-party-supplied content, said hosting comprises reading said third-party supplied content and making said third-party supplied content available for access by the user—a result that overrides the routine and conventional sequence of events in electronic communications, even electronic communications.

64.     The preemptive effect of the claims of the '345 patent are concretely circumscribed by specific limitations.  For example, claim 1 of the '345 patent requires:

---

[38] U.S. Patent No. 6,070,176, col. 1:23-56.

[39] Patent claims addressing gathering and/or identifying content using a guiding means have been found patent eligible.  *See Gonzalez v. InfoStream Group, Inc.,* Case. No. 2-14-cv-00906, Dkt. No. 160 at 8 (February 6, 2016 E.D. Tex.) ("The 'guiding' limitation, however, describes a more specific and concrete way of processing information.  Many ways of gathering information exist besides obtaining it by 'guiding' a subscriber.").

A method of providing a plurality of contents to a user of a client computer system, the method comprising the steps of:

providing a server computer;

retrieving the third-party-supplied content comprising first objects describing a product or service, wherein retrieving is from a third-party-hosting server, said retrieving is performed by the server computer;

hosting on the server computer said third-party-supplied content, said hosting comprises reading said third-party supplied content and making said third-party supplied content available for access by the user;

transmitting a web page for display on the client computer system in response to a request from the client computer system, the web page comprising the third-party-supplied content;

selecting guiding means from said third-party-supplied content for use in identifying related second content;

identifying the related second content using the guiding means, wherein the related second content comprises an object that is related to an object within the first objects of the third-party-supplied content;

including the second content in the web page to form a second web page, said including is performed by the server computer; and

sending the second web page to the client computer system for display on the client computer system with the web page previously transmitted.

65.     The '345 patent does not attempt to preempt every application of the idea of managing web content transmitted over a computer network, or even the idea of managing web content retrieved from a third-party server.

66.     The '345 patent does not preempt the field of web content management systems, or prevent use of alternative third-party web content management systems.  For example, the '345 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for achieving content aggregation from third parties, and they ensure that the claims do not preempt other techniques for web content management.  Further, the ninety-three patents cited in the prosecution history include numerous systems that are not preempted by the claims of the '345 patent.

67.     The '345 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.

68.     The claimed subject matter of the '345 patent is not a pre-existing but undiscovered algorithm.

69.     The '345 patent claims require the use of a computer system.

70.     The methods claimed in the '345 patent were not a longstanding or fundamental economic practice at the time of the patented inventions.  Nor were they fundamental principles in ubiquitous use on the internet or computers in general.  For example, the '345 patent specification describes limitations in the existing systems at the time the inventions disclosed in the '345 patent were conceived.  "Currently, dynamic e-mail will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops."  '345 patent, col. 1:54-59.

71.     One or more claims of the '345 patent require a specific configuration of electronic devices, a network configuration, and the web servers to retrieve third party supplied content.  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '345 patent illustrates a specific configuration of hardware disclosed in the patent.



'345 patent, Fig. 15.

72.     One or more of the '345 patent claims require a server to use the guiding means (e.g. keywords, content page's objects, content page's hidden elements, etc.) of first content and locate a second content based on the guiding means, this is in the realm of the computer network/Internet to enable one or more contents located at different locations and be associated based on their objects and the associated contents displayed together on a webpage.  This cannot be done by hand or by mind.

### 2.     U.S. Patent No. 8,065,386

73.     U.S. Patent No. 8,065,386 ("the '386 patent") entitled, *Method of Presenting Contents Based on a Common Relationship*, was filed on October 30, 2007, and claims priority to December 20, 2001.  UnoWeb is the owner by assignment of the '386 patent.  A true and

correct copy of the '386 patent is attached hereto as Exhibit B.  The '386 patent claims specific systems for providing requested contents and unrequested associated contents to a client computer system wherein a website server receives a request from the client computer system to send a web page for display on the client computer and a provider examines the requested web page's content, identifies related content, and includes the related content in the web page.

74.     The '386 patent claims a technical solution to a problem unique to computer networks – causing the server computer to provide unrequested content to a client computer based on indexing content in a database table.

75.     The inventions disclosed in the '386 patent are directed to solving problems unique to e-commerce.  For example, the '386 patent specification describes existing systems "will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops."  '386 patent, col. 1:57-60.

76.     The '386 patent discloses a specific system for organizing data gathered from third party servers and then relating that data to second gathered data and then sending the second data for display on a webpage.  Such gathering, indexing, and generating of content has been found patent eligible.[40]

77.     The '386 patent addresses a problem faced by web site owners who had a need for providing first content and associated second content to a user of a client computer system.  The provider's server receives a request from the client computer system to send a first object in an HTML page for display on the client computer system.  The provider examines the requested first object and includes a related second object in the HTML page.  The '386 patent is directed towards generating a composite web page that combines certain aspects of a host website with

---

[40] *See e.g., Mirror World Techs. LLC v. Apple Inc., et al*, Case No. 13-cv-419, Dkt. No. 346 at 18 (E.D. Tex. July 7, 2015) (Upholding the patent eligibility of claims where "the invention is a method whereby a computer system organizes every data unit that it receives or generates chronologically with time stamps."); *Motion Inc. v. BSP Software LLC et al*, Case No. 12-cv-647, Dkt. No. 226 at 10 (E.D. Tex. Jan. 4, 2016) (upholding the patent eligibility of a patent directed at a method for providing version control using an automated agent).

information from a third-party merchant.  Claims that are similar to '386 patent claims have been found patent eligible.[41]

78.     One or more claims of the '386 patent discloses the use of keyword indexing to relate first content with unrequested second content.  A patent assigned to Amazon that references the parent application to the '386 patent describes the need to identify content based on keywords as arising from problems particular to the internet.

> Because of the large number of search results, and the correspondingly large number of pages displaying those search results, a user may have difficulty finding websites of interest to the user, particularly if the relevant website is displayed on a fourth, fifth, or even later page of search results.[42]

79.     The '386 patent contains limitations including "indexing" via the "server computer," "forming a data base table," "hosted at the third-party's server," and "encoded information," that are specific to specialized computer systems and require more than a general purpose computer.

80.     At the time of the inventions claimed in the '386 patent, processing, transmitting, and identifying content to provide to a webpage presented new and unique issues over the state of the art.  As explained in the '386 patent: "The e-commerce and the e-services may or may not reside at the same location.  They can be at a single or multiple URL addresses, folders, databases or database tables."  '386 patent, col. 19:20-22.

---

[41] *DDR Holdings v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014) (Invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant were patent eligible because the invention addressed an important challenge (*i.e.*, retaining website visitors through the use of computer technology).); *KlausTech, Inc. v. Admob, Inc.*, Case. No. 10-cv-05899, Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (Upholding the validity of an internet advertising patent that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm."); *Mirror World Techs. LLC v. Apple Inc., et al*, Case No. 13-cv-419, Dkt. No. 346 at 18 (E.D. Tex. July 7, 2015) (Upholding the patent eligibility of claims where "the invention is a method whereby a computer system organizes every data unit that it receives or generates chronologically with time stamps.").

[42] U.S. Patent No. 9,141,713 (this patent, assigned to Amazon Technologies, Inc., references UnoWeb Patent App. 10/029,073 as relevant prior art).

81.     Although the methods taught in the '386 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '386 patent claims were innovative and novel.  "Currently, dynamic e-mall will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops."  '386 patent, col. 1:57-60.

82.     Further, the inventions claimed in the '386 patent improve upon the functioning of a computer system by using key word indexing to identify second content and displaying the second content to a user.  This improves the functioning of the computer system by more efficiently identifying relevant second content and reducing computational requests for relevant content.

83.     The '386 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods for retrieving a second piece of content that is on a third-party web server using a keyword index.

84.     The '386 patent claims are not directed at the broad concept/idea of "content management."  Instead, they are limited to a concretely circumscribed set of methods for retrieving the third-party-supplied content, stored on a third-party server, using a key word index stored in a database table.  These systems are technologies unique to the internet age.

85.     The inventive concepts claimed in the '386 patent are technological, not "entrepreneurial."  For example, identifying content from a third-party hosted server is a specific, concrete solution to the technological problem of transferring information from a third party for display on a webpage.

86.     The '386 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of web content management.  For example, claims of the '386 patent require hosting on the server computer said third-party-supplied content, said

hosting comprises reading said third-party supplied content, making said third-party supplied content available for access by the user, identifying a second content by finding a relationship between the second content and the object selected —a result that overrides the routine and conventional sequence of events in electronic communications.

87.     The preemptive effect of the claims of the '386 patent are concretely circumscribed by specific limitations.  For example, claim 4 of the '386 patent requires:

> A computer program product having executable instruction codes that are stored on a non-transitory computer-readable medium on a server computer, the instruction codes when executed by the server computer causes the server computer to provide unrequested content to a client computer and perform steps comprising:
>
> receiving a third-party-supplied first content, wherein said receiving is performed by the server computer;
>
> incorporating said third-party-supplied first content into a host on the server computer, wherein said incorporating is done by the server computer;
>
> said third-party-supplied first content comprising a plurality of objects, each object in the plurality of objects selected from the group consisting of text, image, form element, audio, video, link and key word;
>
> indexing said plurality of objects, wherein the indexing is performed by the server computer;
>
> forming a database table containing objects in the plurality of objects, wherein forming is performed by the server computer;
>
> accessing the database table and selecting an object in the plurality of objects using the index, wherein selecting is performed by the server computer;
>
> identifying a second content by finding a relationship between the second content and the object selected, wherein identifying is performed by the server computer; and
>
> sending the second content for receipt and display on the client computer, wherein sending is performed by the server computer.

88.     The '386 patent does not attempt to preempt every application of the idea of managing web content transmitted over a computer network, or even the idea of managing web content retrieved from a third-party server.  The 87 patents cited in the prosecution history of the '386 patent provide numerous examples of identifying and including related content in a request web page that are not preempted by the claims in the '386 patent.

89.    The '386 patent does not preempt the field of web content management systems, or prevent use of alternative third-party web content management systems.  For example, the '386 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for achieving content aggregation from third parties, and they ensure that the claims do not preempt other techniques for web content management.

90.    The '386 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.  Nor is the claimed subject matter of the '386 patent a pre-existing but undiscovered algorithm.

91.    The systems claimed in the '386 patent were not a longstanding or fundamental economic practice at the time of the patented inventions.  Nor were they fundamental principles in ubiquitous use on the internet or computers in general.  One or more claims of the '386 patent require a specific configuration of electronic devices, a network configuration, and the web servers to retrieve third party supplied content.  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '386 patent illustrates a specific configuration of hardware disclosed in the patent.



'386 patent, Fig. 28.

## INTERNET ADVERTISING PATENTS

92.     UnoWeb's Internet Advertising Patents disclose specific computer based systems and methods for an internet hosting environment to manage advertising and content and provide compensation to content providers.  Companies such as Google, International Business Machines, and Hewlett-Packard have identified the internet as creating "unprecedented" new challenges unique to internet advertising and arising from problems directly created by the internet.

> *The recent development of on-line networks*, such as America On-Line, Compuserve, and the Internet, has led to "on-line" advertising.  For example, on the Internet, often such on-line advertisements will appear on a web page, such as a banner on the top or the bottom of the page. . . . In addition, if a user of such computer networks *is continuously exposed to the same advertisement, the response rate to the advertisement will generally decline*.  Therefore, it is highly

desirable to have a system that controls the frequency of exposure of advertisements to particular users.[43]

A further need exists for methods and apparatus for dynamic placement, management, and monitoring of blog advertising that generate additional revenue for bloggers and provide improved targeting for advertisers.[44]

The proliferation of the Internet has facilitated the sharing and distribution of content and data like never before.  Users now flock to websites, search engines, and social networks to access and share content and data.  The amount of data available is estimated to be on the order of millions of terabytes.  ***Along with this data comes an unprecedented opportunity to explore it for business purposes as well as a responsibility and need to respect the privacy of users***.[45]

93.     UnoWeb's Internet Advertising Patents are directed to solving a problem unique to the internet.  "Currently, there is no fair and just mechanism for compensating all of the involved parties helping in the generating of the income stream for the hosting site, content provider and user (user is the one who reads, views and clicks over the paid content, or one who is a buyer who buys goods or services associated with the non-paid content . . . ."  '384 patent, col. 3:20-25.

94.     Alliance Data has recognized the value of providing relevant contextual advertising that compensates content providers.

Commission Junction's product catalog functionality allows links to your products to be available to the entire CJ Marketplace, or a select few publishers if desired.  ***Product links enable you to integrate buying opportunities directly within relevant content for immediate purchasing opportunities***.  For example, on a Web site about the Caribbean, a publisher could place a CD of Caribbean music from an online record vendor somewhere in an article about the native music.[46]

---

[43] U.S. Patent No. 5,948,061, col. 1:29-59 (assigned Google, Inc. and issued September 7, 1999) (emphasis added).

[44] U.S. Patent App. 12/826,924 at ¶ 4 (assigned to International Business Machines Corporation which cites the '139 patent as a relevant prior art reference).

[45] U.S. Patent No. 8,589,292, col. 1:6-13 (citing the '384 patent as relevant prior art) (emphasis added).

[46] *Commission Advertiser Product Data*, COMMISSION JUNCTION DATA TRANSFER GUIDE V 6.0 at 1 (November 2010) (emphasis added).

1. **U.S. Patent No. 7,987,139**

95.     U.S. Patent No. 7,987,139 ("the '139 patent") entitled, *Advertising Revenue Sharing*, was filed on June 17, 2010, and claims priority to February 21, 2007.  UnoWeb is the owner by assignment of the '139 patent.  A true and correct copy of the '139 patent is attached hereto as Exhibit C.  The '139 patent relates to specific methods for web site development based on advertising revenue sharing.

96.     The '139 patent claims a technical solution to a problem unique to internet advertising – revenue sharing between the content provider/writer, website hosting the content, and the user clicking on the advertising associated with said content and content distributor.

97.     The '139 patent claims at least three important and concrete innovations that improve internet advertising: (1) registering a content provider to prepare non-paid content for the webpage on a computer; (2) setting a time period before which paid content can be redisplayed to a registered user; and (3) paying the content provider for the number of interactions of the registered user with the paid content.

98.     At the time of the inventions claimed in the '139 patent, electronically structuring revenue sharing between content providers and advertisers presented new and unique issues over the state of the art.  As explained in the '139 patent: "The content hosting site places paid content along with user provided content without creating any fair means for compensating those who helps generate the revenue stream." '139 patent, col. 1:47-50.

99.     The '139 patent is directed at solving a problem that arises from internet advertising where there is a need to compensate third party content providers for displaying on web pages paid advertisements from parties unaffiliated with the content provider.  This problem has been identified by major companies such as IBM and Xerox (in patents and patent applications that reference the UnoWeb patents) as unique to the internet.

> In addition, it is difficult for advertisers to determine where to best place advertisements, since content is diffusely spread over the Internet.  A need therefore exists for methods and apparatus for dynamic placement, management and monitoring of blog advertising.  ***A further need exists for methods and apparatus for dynamic placement, management and monitoring of blog***

> ***advertising that generate additional revenue for bloggers*** and provide improved targeting for advertisers.[47]
>
> However, ***dynamic digital solutions or products create issues with respect to collection of fees and the distribution of such fees*** to the appropriate entities because conventionally, the conventional form of payment for digital content and/or services has been a single payment mechanism, such as the user making a single payment to a single entity for the dynamic digital solution.[48]

100.    Although the systems and methods taught in the '139 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '139 patent were innovative and novel.  "Currently, content writers write content that are integrated onto a blog-portal, virtual community and others, the content writer does all the intellectual work and the hosting environment inserts advertisings and other paid content along the user-provided content without compensating the intellectual proprietor whatsoever."  '139 patent, col. 1:21-27.

101.    The '139 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods and systems that provide a conduit for internet advertising revenue sharing between content providers and advertisers.

102.    The '139 patent claims are not directed at the broad concept/idea of "advertising." Instead, the '139 patent claims are limited to a concretely circumscribed set of methods and systems for authorizing and managing revenue sharing for internet advertising between content providers and advertisers.  These methods and systems are technologies unique to the internet age.  A 2013 New York Times article described this problem as rooted in the architecture of providing advertising using the internet.

> But affiliate marketing has a dark side: It can be a sure path to getting defrauded. Even Santa Claus is vulnerable.  Within hours of joining an affiliate network, the Santa Claus store had two dozen websites signed on as affiliates and claiming

---

[47] U.S. Patent App. 12/826,924 at ¶ 4 (emphasis added) (assigned to International Business Machines Corporation which cites the '139 patent as a relevant prior art reference).

[48] U.S. patent No. 9,196,000 (emphasis added) (assigned to Xerox Corporation and referencing UnoWeb's U.S. Patent No. 7,580,858).

commissions.   "We were, like, 'Wow, that was easy,' "said Andy Teare, the store's general manager.[49]

103.    The '139 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of distributed computing.  For example, one or more claims of the '139 patent require totaling a number of interactions by the registered user with the paid content, wherein the interaction of the registered user comprises viewing the webpage.

104.    The '139 patent is directed toward enabling revenue sharing between internet content providers and internet advertisers (*i.e.*, enabling the placement of internet advertising on third party maintained webpages through the use of computer technology).  Claims such as those in the '139 patent that are directed at a problem unique to the internet have been found patent eligible by the U.S. Court of Appeals for the Federal Circuit and numerous district courts.[50]

105.    One or more of the '139 patent claims require a time threshold before which paid content can be redisplayed to a registered user.  This use of a time threshold to manage the redisplaying of paid content is direct to solving "internet click fraud" a problem unique to the realm of the internet.  Thus one or more of the '139 patent claims are directed toward a problem specific to the internet.[51]

---

[49] Mark Cohen, *Surviving the Dark Side of Affiliate Marketing,* NY TIMES (December 4, 2013).

[50] *See e.g., DDR Holdings v. Hotels.com,* 773 F.3d 1245 (Fed. Cir. 2014) (Invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant was patent eligible because the invention addressed an important challenge (*i.e.,* retaining website visitors through the use of computer technology).); *KlausTech, Inc. v. Admob, Inc.,* Case. No. 10-cv-05899, Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (Upholding the validity of an internet advertising patents that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm."); *Advanced Marketing Sys., LLC v. CVS Pharmacy, Inc.,* Case No. 15-cv-00134 Dkt. No. 77 at 10 (E.D. Tex. November 19, 2015) (Order Adopted at Dkt. No. 95 Jan. 25, 2016) (Denying without prejudice Defendants' motion to dismiss patents directed to discount coupons "The presence of these structures counsels away from summarily concluding that the asserted claims are directed to an abstract idea.").

[51] *See* '139 patent, col. 6:2-7 ("[B]e allowed to appear to the same viewer only a number of times during the session, etc., it will help the server to identify multiple clicks over the same content by the same clicker and invalidate clicks in such situations thus preventing fraud."); see also Lee B. Burgunder, The Legal Aspects of Managing Technology at 446—7 (2010) ("one variant of fraud

106.     The preemptive effect of the claims of the '139 patent are concretely circumscribed by specific limitations.  For example, claim 2 of the '139 patent requires:

> A method of web site development based on advertising revenue sharing, comprising the steps of:
>
>> enabling a person to become a registered user;
>>
>> displaying paid content from an advertiser through a webpage of the web site on a computer;
>>
>> registering a content provider to prepare non-paid content for the webpage on a computer;
>>
>> setting a time period before which paid content can be redisplayed to a registered user;
>>
>> setting a maximum number of times that paid content can be displayed to a registered user;
>>
>> totaling a number of times the paid content is displayed to the registered user;
>>
>> receiving payment from the advertiser for the number of times the paid content is displayed to the registered user; and,
>>
>> paying the content provider for the number of interactions of the registered user with the paid content.

107.     The '139 patent does not attempt to preempt every application of the idea of internet advertising revenue sharing.  For example, the prior art cited in the prosecution history of the '139 patent provides several examples of systems and methods of internet advertising and revenue sharing that are not preempted by the claims of the '139 patent.

108.     The '139 patent does not preempt the field of internet advertising revenue sharing. For example, the '139 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth. These inventive elements are not necessary or obvious tools for achieving internet advertising revenue sharing, and they ensure that the claims do not preempt other techniques of compensating content providers for internet advertising.  For example, the '139 patent describes numerous techniques for electronically structuring internet advertising revenue sharing.  The techniques inform the invention's development but do not, standing alone, fall within the scope

---

that is more unique to the internet is called click-fraud.  Click-fraud results when a person takes steps to imitate legitimate views.").

of its claims.  For example, one or more claims of the '139 patent require: (1) setting a maximum number of times that paid content can be displayed to a registered user; (2) logging-in a registered user to allow the registered user to interact with the paid content on a computer; (3) setting a time period before which paid content can be redisplayed to a registered user; (4) totaling a number of times the paid content is displayed to the registered user; and (5) setting a time period before which paid content can be redisplayed to a registered user.

109.    The '139 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.

110.    The '139 patent claims systems and methods not merely for managing revenue sharing for internet advertising, but for making the computer network itself more efficient.

111.    The '139 patent claims systems and methods that "could not conceivably be performed in the human mind or pencil and paper."  The claimed inventions in the '139 claims are rooted in computer technology and overcomes problems specifically arising in the realm of computer networks, for instance click-fraud.  Click fraud has been recognized by companies such as Yahoo!, Inc.,[52] Microsoft,[53] and Cox Communications[54] as being a problem unique to and arising from the internet.

112.    The systems and methods claimed in the '139 patent were not a longstanding or fundamental economic practice at the time of patented inventions.  Nor were they fundamental principles in ubiquitous use on the internet or computers in general.  One or more claims of the '139 patent require a specific configuration of electronic devices, a network configuration,

---

[52] *See e.g.,* U.S. Patent No. 8,655,724 (This patent assigned to Yahoo! states "'Click-based' online advertising systems require an advertiser to pay the system operator or its partners each time a user selects or "clicks" on the advertiser's online advertisement or sponsored search link. Unfortunately, the nature of such a system provides opportunities for some to click on ads for improper or fraudulent reasons. This is referred to generally as 'click fraud.'").

[53] *See e.g.,* U.S. Patent App. 13/406,532 (This application assigned to Microsoft states "The present technology is directed to analyzing aspects of advertising traffic in an online advertising system and monitoring.").

[54] U.S. Patent 8,763,117 (This patent assigned to Cox Communications states "Click fraud involves the user's computer visiting websites without the user's awareness to create false web traffic for the purpose of personal or commercial gain.").

external databases, a computer network interface, etc..  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '139 patent illustrates a specific configuration of hardware disclosed in the patent.



'139 patent, Fig. 2.

### 2.      U.S. Patent No. 8,140,384

113.      U.S. Patent No. 8,140,384 ("the '384 patent") entitled, *Advertising Revenue Sharing*, was filed on June 9, 2011, and claims priority to February 21, 2007.  UnoWeb is the owner by assignment of the '384 patent.  A true and correct copy of the '384 patent is attached hereto as Exhibit D.  The '384 patent relates to specific methods for web site development based on advertising revenue sharing.

114.      The '384 patent claims a technical solution to a problem unique to internet advertising – revenue sharing between the content provider/writer, website hosting the content and the user clicking on the advertisings associated with said content and content distributor.

115.     At the time of the inventions claimed in the '384 patent, electronically structuring revenue sharing between content providers and advertisers presented new and unique issues over the state of the art.  As explained in the '384 patent: "With the explosion of ways for presenting online content over the Internet, there are a number of content hosting sites like, but not limited to: blogs, RSS (Really Simple Syndicate), virtual communities, photo sharing sites, video sharing sites, etc.  These hosting environments offer means for their user base to place and view contents, the hosting environment in turn places paid contents inserted into the user provided contents or along with, ***without any kind of compensation whatsoever for the content provider*** nor to any other involved party taking part in generating the income."  '384 patent, col. 3:10-19 (emphasis added).

116.     Although the methods taught in the '384 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '384 patent claims were innovative and novel.

> Currently, there is no fair and just mechanism for compensating all of the involved parties helping in the generating of the income stream for the hosting site, content provider and user (user is the one Who reads, views and clicks over the paid content, or one Who is a buyer Who buys goods or services associated With the non-paid content, henceforth called user, viewer or clicker and herein such terms are used interchangeably).

'384 patent, col. 3:20-27.

117.     The '384 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods that provide a conduit for internet advertising revenue sharing between content providers and advertisers.

118.     The '384 patent claims at least three important and concrete innovations that improve internet advertising: (1) combining the non-paid content and the paid content into a page; (2) determining if the second click is received after expiration of the time period; (3) providing a clickable link to paid content from a content distributor on the server computer; and

(4) paying the content distributor for the number of times the user interacted with the content page.

119.    The '384 patent claims are not directed at the broad concept/idea of "advertising." Instead, the '384 patent claims are limited to a concretely circumscribed set of methods for authorizing and managing revenue sharing for internet advertising between content providers and advertisers.  These methods are technologies unique to the internet age.

120.    The '384 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of distributed computing.  For example, one or more claims of the '384 patent require totaling a number of interactions by the registered user with the paid content, wherein the interaction of the registered user comprises viewing the webpage.

121.    The '384 patent is directed to specific problems in the field of internet advertising for web site development.  The '384 patent is directed toward enabling revenue sharing between internet content providers and internet advertisers (*i.e.*, enabling the placement of internet advertising on third party maintained webpages through the use of computer technology).  Claims such as those in the '384 patent that are directed at a problem unique to the internet have been found patent eligible by the U.S. Court of Appeals for the Federal Circuit and numerous district courts.[55]

---

[55] *See e.g., DDR Holdings v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014) (Invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant was eligible for patenting because the invention addressed an important challenge (*i.e.*, retaining website visitors through the use of computer technology).); *KlausTech, Inc. v. Admob, Inc.*, Case. No. 10-cv-05899, Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (Upholding the validity of an internet advertising patent that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm."); *Advanced Marketing Sys., LLC v. CVS Pharmacy, Inc.*, Case No. 15-cv-00134, Dkt. No. 77 at 10 (E.D. Tex. Nov. 19, 2015) (Order Adopted at Dkt. No. 95 Jan. 25, 2016) (Denying without prejudice Defendants' motion to dismiss patents directed to discount coupons "The presence of these structures counsels away from summarily concluding that the asserted claims are directed to an abstract idea.").

122.    The preemptive effect of the claims of the '384 patent are concretely
circumscribed by specific limitations.  For example, claim 7 of the '384 patent requires:

> A method of web site development based on advertising revenue sharing,
> comprising the steps of:
>
>> providing a server computer;
>>
>> combining content with an advertisement;
>>
>> sending the content and advertisement to a user accessing the server
>> computer;
>>
>> receiving at the server computer a first click on the advertisement, the first
>> click sent by the user;
>>
>> saving a first indication of receiving the first click;
>>
>> receiving a second click on the advertisement, the second click sent by the
>> user;
>>
>> setting a time period;
>>
>> determining if the second click is received after expiration of the time
>> period;
>>
>> saving a second indication of the second click if the second click occurs
>> after expiration of the time period; and
>>
>> charging an advertiser for each saved indication.

123.    The '384 patent does not attempt to preempt every application of the idea of
internet advertising revenue sharing.  For example, the prior art cited in the prosecution history
of the '384 patent provides several examples of systems and methods of internet advertising that
are not preempted by the claims of the '384 patent.

124.    The '384 patent does not preempt the field of internet advertising revenue sharing.
For example, the '384 patent includes inventive elements—embodied in specific claim
limitations—that concretely circumscribe the patented invention and greatly limit its breadth.
These inventive elements are not necessary or obvious tools for achieving internet advertising
revenue sharing, and they ensure that the claims do not preempt other techniques of
compensating content providers for internet advertising.

125.    For example, the '384 patent describes numerous techniques for electronically
structuring internet advertising revenue sharing.  The techniques inform the invention's
development but do not, standing alone, fall within the scope of its claims.

126.    The '384 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.

127.    The '384 patent claims methods that "could not conceivably be performed in the human mind or pencil and paper."

128.    The claimed inventions in the '384 claims are rooted in computer technology and overcomes problems specifically arising in the realm of computer networks, for instance: click fraud.

129.    The methods claimed in the '384 patent were not a longstanding or fundamental economic practice at the time of patented inventions.  Nor were they fundamental principles in ubiquitous use on the internet or computers in general.

130.    The asserted claims do not involve a method of doing business that happens to be implemented on a computer; instead, they involve a method for managing internet advertising in a way that will affect the web server system itself, by making it more efficient.

131.    One or more claims of the '384 patent require a specific configuration of electronic devices, a network configuration, external databases, a computer network interface, etc..  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '384 patent illustrates a specific configuration of hardware disclosed in the patent.



'384 patent, Fig. 1.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,941,345

132.   UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

133.   Alliance Data makes, uses, sells, and/or offers for sale in the United States products and/or services for web content management.

134.   Alliance Data makes, sells, offers to sell, imports, and/or uses CJ Affiliate (the "Alliance Data '345 Product").

135.   On information and belief, the Alliance Data '345 Product includes web content management software.

136.   On information and belief, the Alliance Data '345 Product is available to businesses and individuals throughout the United States.

137.    On information and belief, the Alliance Data '345 Product is provided to businesses and individuals located in the Eastern District of Texas.

138.    On information and belief, the Alliance Data '345 Product retrieves third-party-supplied content comprising first objects describing a product or service.  The Alliance Data '345 Product retrieves content from a third-party-hosting server.

139.    On information and belief, the Alliance Data '345 Product hosts on Alliance Data computers said third-party-supplied content.  Alliance Data reads third-party-supplied content and makes third-party supplied content available to users.

140.    On information and belief, the Alliance Data '345 Product enables the transmitting of a web page for display on the client computer system in response to a request from the client computer system.  The web pages that are transmitted by Alliance Data include third-party-supplied content.

141.    On information and belief, CJ Affiliate gathers third-party-supplied content from servers as shown in the below diagram.



*Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf ("We collect your product data in a variety of ways: (1) you can send us a raw product feed, we can scan you website for product data, you can grant us access to your API or developer database.").

142.    On information and belief, CJ Affiliate collects third party supplied content which comprises images, descriptions, key words, etc.

> CJ shall use certain CJ and/or CJ-selected third party technology to scan Advertiser's website(s) and collect Advertiser's product data, including, but not limited to, product image, price, description, and SKU number and modify data fields in such product data to generate a product catalog consistent with CJ specifications and/or other CJ-approved online marketing channels, as applicable.

*CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2 (emphasis added).

143.    On information and belief, CJ Affiliate collects third party content including keywords, links, text, etc.  This third party supplied content is stored on the CJ Affiliate server as shown in this document from CJ Affiliate documentation.

> The required parameters (NAME, KEYWORDS, DESCRIPTION, SKU, BUYURL, AVAILABLE, PRICE) must be provided in the body of your file and listed in the PARAMETERS portion of the header. Any non-required parameters you provide must also be listed in the PARAMETERS list.

*Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 11 (November 2010).

144.    On information and belief, the Alliance Data '345 Product enables the use of a selecting guiding means from said third-party-supplied content for use in identifying related second content.

145.    On information and belief, the Alliance Data '345 Product enables identifying related second content using the guiding means, wherein the related second content comprises an object that is related to an object within the first objects of the third-party-supplied content.

146.    On information and belief, the Alliance Data '345 Product enables the inclusion of second content in the webpage that is served by the server computer operated by Alliance Data.

147.    On information and belief, Alliance has directly infringed and continues to directly infringe the '345 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, Alliance Data '345 Product, which includes infringing web content management technologies.

148.    By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to Alliance Data '345 Product, Alliance Data has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '345 patent, including at least claims 1-8, pursuant to 35 U.S.C. § 271(a).

149.    On information and belief, Alliance Data also indirectly infringes the '345 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

150.    On information and belief, Alliance Data has had knowledge of the '345 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Alliance Data knew of the '345 patent and knew of its infringement, including by way of this lawsuit.

151.    On information and belief, Alliance Data intended to induce patent infringement by third-party customers and users of the Alliance Data '345 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Alliance Data specifically intended and was aware that the normal and customary use of the accused products would infringe the '345 patent.  Alliance Data performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '345 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Alliance Data provides the Alliance Data '345 Product that has the capability of operating in a manner that infringe one or more of the claims of the '345 patent, including at least claims 1-8, and Alliance Data further provides documentation and training materials that cause customers and end users of the Alliance Data '345 Product to utilize the product in a manner that directly infringe one or more claims of the '345 patent.  By providing instruction and training to customers and end-users on how to use the Alliance Data '345 Product in a manner that directly infringes one or more claims of the '345 patent, including at least claims 1-8, Alliance Data specifically intended to induce infringement of the '345 patent. On information and belief, Alliance Data engaged in such inducement to promote the sales of the

Alliance Data '345 Products, *e.g.,* through CJ Affiliate manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '345 patent.[56] Accordingly, Alliance Data has induced and continues to induce users of the accused product to use the accused product in its ordinary and customary way to infringe the '345 patent, knowing that such use constitutes infringement of the '345 patent.

152.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '345 patent.

153.    As a result of Alliance Data's infringement of the '345 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Alliance Data's infringement, but in no event less than a reasonable royalty for the use made of the invention by Alliance Data together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Alliance Data's infringing activities are enjoined by this Court.

154.    Unless a permanent injunction is issued enjoining Alliance Data and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '345 patent, UnoWeb will be greatly and irreparably harmed.

---

[56] *Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf; *Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010); *CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2; *CJ Affiliate Account Manager Site*, (last visited January 5, 2016), available at: http://www.cj.com/publisher/cj-product-widgets; Hal Arnold, *Commission Junction Technology Stack: In Under 600 Words,* CJ BLOG (January 23, 2013), available at: http://blog.cj.com/01232013/commission-junction-technology-stack-under-600-word; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 8,065,386

155.    UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

156.    Alliance Data makes, uses, sells, and/or offers for sale in the United States products and/or services for web content management.

157.    Alliance Data makes, sells, offers to sell, imports, and/or uses CJ Affiliate (the "Alliance Data '386 Product").

158.    On information and belief, the Alliance Data '386 Product includes web content management software.

159.    On information and belief, the Alliance Data '386 Product is available to businesses and individuals throughout the United States.

160.    On information and belief, the Alliance Data '386 Product is provided to businesses and individuals located in the Eastern District of Texas.

161.    On information and belief, the Alliance Data '386 Product receives third-party-supplied first content, wherein said receiving is performed by the server computer.

162.    On information and belief, the Alliance Data '386 Product indexes third-party-supplied content as shown in the below excerpt from Alliance Data's documentation.



*CJ Affiliate Account Manager Site*, (last visited January 5, 2016), available at: http://www.cj.com/publisher/cj-product-widgets (showing that the content that is indexed and accessible through the CJ Affiliate Widget is indexed by Advertiser, Keyword, SKU, Price, Currency and Service Area).

163.   On information and belief, the Alliance Data '386 Product includes a widget that retrieves content based on indexed information.  The below screen shot from Alliance Data documentation shows that a widget retrieves content and maps it to a relationship with the advertiser.



*CJ Affiliate Members Site – Widget Setup*, available at:
https://members.cj.com/member/4184384/publisher/widgets/index.cj#createWidget/grid (last visited January 5, 2016) (Showing that a widget will retrieve content based on information that is indexed with the Widget.  This information includes whether the user has a relationship with the advertiser.  "Automatically delete products when: Relationship with advertiser expires?").

164.   On information and belief, the CJ Affiliate website receives third-party supplied first content, wherein said receiving is performed by the server computer.  The third-party supplied content includes Product Catalogs.  The product catalog includes product images, price, description, and SKU number and modify data fields.  This content is stored on the CJ Affiliate Server.

CJ shall use certain CJ and/or CJ-selected third party technology to scan Advertiser's website(s) and collect Advertiser's product data, including, but not limited to, product image, price, description, and SKU number and modify data fields in such product data to generate a product catalog consistent with CJ specifications and/or other CJ-approved online marketing channels, as applicable.
*CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2.

165.   On information and belief, CJ Affiliate incorporates the third-party-supplied first content into a host on the server computer, wherein the incorporating is done by the server

computer.  According to CJ Affiliate documentation third-party content such as product images,

prices, text, key words, etc. are incorporated into a host on the server computer.

> We first standardize, then optimize your data by applying proven mapping techniques, creating additional and useful fields, streamlining your product taxonomy and more. Your fully optimized product catalog is then sent to the CJ servers for distribution.

*Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf

166.    On information and belief, the Alliance Data '386 Product incorporates the third-

party content into the host on the server computer.  For example, CJ Affiliate indexes product

catalog data received by the CJ Affiliate server system in ASCII format.

> Setting up a data transfer subscription with Commission Junction enables you to transfer your product catalog data in an ASCII file for import into our system. The product information you transfer will be available as content providers search for links within the Commission Junction product catalog (you may request to remove access to your catalog in publisher searches upon request, however). Should your inventory change or if products become unavailable for a period of time, you can simply transfer additional files reflecting the changes.

*Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010) (explaining how commission junction aka CJ Affiliate incorporates third party data).

167.    The below diagram from CJ Affiliate documentation shows that third party

content provided by a CJ Affiliate is incorporated and stored on the CJ server.



*Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010) (blue arrows indicating the two transfer mechanisms for third party content).

168.    On information and belief, the Alliance Data '386 Product receives third-party-supplied first content received by the CJ Affiliate server comprises a plurality of objects, each object in the plurality of objects selected from the groups consisting of text, image, form element, audio, video, link, and key word.  For example, the third-party supplied content comprises objects including images, descriptions, text, key words.

> CJ shall use certain CJ and/or CJ-selected third party technology to scan Advertiser's website(s) and ***collect Advertiser's product data, including, but not limited to, product image, price, description, and SKU number and modify data fields*** in such product data to generate a product catalog consistent with CJ specifications and/or other CJ-approved online marketing channels, as applicable.

*CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2 (emphasis added).

169.    On information and belief, the Alliance Data '386 Product indexes the plurality of objects (first third party content) on the server computer.  The below documentation describes this process as "processing."

> Once you transfer your data file, Commission Junction sends an import receipt confirmation email prior to processing. Once a data file processes, you receive a confirmation (or rejection) report . Your results report format and transport method depends on which data format (Name/Value, TAB, PIPE, CSV or XML) and transport method (Email or CJ FTP) you selected during setup. If you choose email as your transport method, you receive an email containing the results report in your selected data format. If you choose CJ FTP as your transport method, you receive an email confirming import, an email confirming your data is available via CJ FTP, and the results report on CJ FTP.
>
> The emailed or CJ FTP-ed results report details information relevant to the file provided, and displays the information in the format you previously selected. If you selected email as your transport method, the results report displays in the Additional Message section of your email. Regardless of the transport method selected (Email or CJ FTP), a completion email sends to the email address(es) specified in the import subscription settings and displays the following information.
>
>   ▪ Time of processing.
>   ▪ Total records processed.
>   ▪ Total errors.

*Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 22 (November 2010).

170.    On information and belief, the Alliance Data '386 Product takes in the first third-party content and forms a database table containing objects in the plurality of objects, wherein forming is performed by the server computer.

171.    On information and belief, the Alliance Data '386 Product forms a database table (e.g., NoSQL database table) containing objects in the plurality of objects.  *See, e.g.,* Hal Arnold, *Commission Junction Technology Stack: In Under 600 Words,* CJ BLOG (January 23, 2013), available at: http://blog.cj.com/01232013/commission-junction-technology-stack-under-600-words.

172.    On information and belief, CJ Affiliate functionality enables accessing a database table and selecting an object in the plurality of objects using the index.  The selecting is performed by the CJ Affiliate server.  For example, the CJ Affiliate Widget queries the database table to look up objects where the "data-productid='product-1.'"  The objects that are selected include things such as "widget-price," "product info," and "product-info-name" as shown below in the webpage elements captured from embedding the "Widget Code" on a webpage.

HTML Elements Captures from The "Preview Product" "Div Class," generated by embedding the "Get Code" from CJ Affiliate in a webpage.

173.    On information and belief, CJ Affiliate identifies a second content by finding a relationship between the second content and the object selected, wherein identifying is performed by the server computer.  The CJ Affiliate site identifies second content (e.g., advertisement and/or additional products) to display based on the first object selected by the CJ Affiliate server.  For example, the CJ Affiliate Product Catalog Search API will return a second object based on a first object such as the "Advertiser ID," "Advertiser Name," "Currency," "Price," "salePrice," "Manufacturer," and "SKU."  If the first object is the KeyWord shoes, that

server will identify second content based on the KeyWord and then sort based on a parameter such as price.[57]

174.    On information and belief, the CJ Affiliate widget sends second product information for display on the client computer.  The below HTML Elements from a webpage loaded with the CJ Affiliate Widget shows that second content "Product-2" is returned to the client computer by the server.

```
▼<div class="preview-product" data-productid="product-2" style="display: block;">
 ▶<div class="product-info" onclick="top.location.href='http://www.lduhtrp.net/click-7961570-11586853?
 url=http%3A%2F%2Fwww.zappos.com%2Fn%2Fp%2F85022172%2Fc%2F755.html&cjsku=848338011011&widgetid=568c6710e4b03faf4b3997cd'" style="cursor: pointer">…</div>
 ▼<a href=" http://www.lduhtrp.net/click-7961570-11586853?url=http%3A%2F%2Fwww.zap.50221?%2Fc%2F755.html&cjsku=848338011011&widgetid=568c6710e4b03faf4b3997cd" target="_blank">
   <img class="popover" src="http://www.lduhtrp.net/image-7961570-11586853?imgurl=http%3A%2F%2Fwww.z.3%2F1%2F0%2F1%2F6%2F5%2F3101654-p-2x.jpg&widgetid=568c6710e4b03faf4b3997cd">
  </a>
 </div>
```

HTML Elements Captures from The "Preview Product-1" "Div Class," generated by embedding the "Get Code" from CJ Affiliate in a webpage.

175.    On information and belief, the Alliance Data '386 Product hosts on the Alliance Data computers said third-party-supplied content.  Alliance Data reads third-party-supplied content and makes third-party-supplied content available to users.

176.    On information and belief, the Alliance Data '386 Product enables the transmitting of a web page for display on the client computer system in response to a request from the client computer system.  The web pages that are transmitted by Alliance Data include third-party-supplied content.

177.    On information and belief, Alliance Data has directly infringed and continues to directly infringe the '386 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, Alliance Data '386 Product, which includes infringing web content management technologies.

---

[57] *CJ Affiliate Product Catalog Search API*, CJ AFFILIATE SUPPORT WEBSITE (last visited January 11, 2016), available at:
http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api ("Suppose the index contains 5,432 possible results.  The system automatically sorts those results based on their relevance to the keywords value (shoes).  Then, the system pulls the top 500 results and sorts those 500 results based on your 'sort-by' value ('price').  Thus, the response includes the 500 most relevant matches, sorted by price."

178.    By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to Alliance Data '386 Product, Alliance Data has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '386 patent, including at least claims 1 and 4-8, pursuant to 35 U.S.C. § 271(a).

179.    On information and belief, Alliance Data also indirectly infringes the '386 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

180.    On information and belief, Alliance Data has had knowledge of the '386 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Alliance Data knew of the '386 patent and knew of its infringement, including by way of this lawsuit.

181.    On information and belief, Alliance Data intended to induce patent infringement by third-party customers and users of the Alliance Data '386 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Alliance Data specifically intended and was aware that the normal and customary use of the accused products would infringe the '386 patent.  Alliance Data performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '386 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Alliance Data provides the Alliance Data '386 Product that has the capability of operating in a manner that infringes one or more of the claims of the '386 patent, including at least claims 1 and 4-8, and Alliance Data further provides documentation and training materials that cause customers and end users of the Alliance Data '386 Product to utilize the product in a manner that directly infringe one or more claims of the '386 patent.  By providing instruction and training to customers and end-users on how to use the Alliance Data '386 Product in a manner that directly infringes one or more claims of the '386 patent, including at least claims 1 and 4-8, Alliance Data specifically intended to induce infringement of the '386 patent.  On information and belief, Alliance Data engaged in such

inducement to promote the sales of the Alliance Data '386 Products, *e.g.,* through CJ Affiliate manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '386 patent.[58]  Accordingly, Alliance Data has induced and continues to induce users of the accused product to use the accused product in its ordinary and customary way to infringe the '386 patent, knowing that such use constitutes infringement of the '386 patent.

182.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '386 patent.

183.   As a result of Alliance Data's infringement of the '386 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Alliance Data's infringement, but in no event less than a reasonable royalty for the use made of the invention by Alliance Data together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Alliance Data's infringing activities are enjoined by this Court.

184.   Unless a permanent injunction is issued enjoining Alliance Data and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '386 patent, UnoWeb will be greatly and irreparably harmed.

---

[58] *Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf; *Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010); *CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2; *CJ Affiliate Account Manager Site*, (last visited January 5, 2016), available at: http://www.cj.com/publisher/cj-product-widgets; Hal Arnold, *Commission Junction Technology Stack: In Under 600 Words,* CJ BLOG (January 23, 2013), available at: http://blog.cj.com/01232013/commission-junction-technology-stack-under-600-word; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 7,987,139

185.    UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

186.    Alliance Data makes, uses, sells, and/or offers for sale in the United States products and/or services for internet advertising revenue sharing.

187.    Alliance Data makes, sells, offers to sell, imports, and/or uses CJ Affiliate (the "Alliance Data '139 Product").

188.    On information and belief, the Alliance Data '139 Product includes internet advertising functionality.

189.    On information and belief, the Alliance Data '139 Product is available to businesses and individuals throughout the United States.

190.    On information and belief, the Alliance Data '139 Product is provided to businesses and individuals located in the Eastern District of Texas.

191.    On information and belief, the Alliance Data '139 Product enables web site development based on advertising revenue sharing.

192.    On information and belief, the Alliance Data '139 Product displays paid content from an advertiser through a webpage on a web site.

193.    On information and belief, the Alliance Data '139 Product enables registering a content provider to provide non-paid content.  For example, the Alliance Data documentation states that "As a new publisher in the CJ Network, you will have to apply to individual advertiser programs before you can promote their products and services and start earning commissions. But before you can even start thinking about what advertiser affiliate programs to join, your website should be optimized with good content that will appeal to not only your website visitors, but the advertisers reviewing your application."[59]

---

[59] *What Publishers Need to Join*, CJ AFFILIATE WEBSITE, *available at*:
http://www.cj.com/publisher/join (last visited February 16, 2016).

194.    On information and belief, the Alliance Data '139 Product enables content providers to register to provide non-paid content.  The below screen shot shows the network profile of a user that is registering to provide non-paid content on the CJ Affiliate Network.



*CJ Affiliate Network Profile*, CJ AFFILIATE MEMBER WEBSITE, available at: https://members.cj.com/member/ (last visited February 14, 2016).

195.    On information and belief, the Alliance Data '139 Product hosts on the Alliance Data computers said third-party-supplied content.  Alliance Data reads third-party-supplied content and makes third-party supplied content available to users.

196.    On information and belief, the Alliance Data '139 Product enables totaling the number of interactions by users of paid content.  These interactions include making a purchase following clicking on an advertising link.  The below documentation from Alliance Data describes the tracking of user interactions with paid content.

> Transaction Reports enable you to easily and reliably track all actions, commissions and financial transactions in order to better manage your programs and accounts.

> Transaction Reports offer you a detailed view of your program's activity in reference to commission and action transactions (events such as a sale or a lead)

for specific advertisers.  You may use these reports to track revenue generated and spent, and analyze the financial results of your program.[60]

197.     On information and belief, the Alliance Data '139 product enables the setting of a maximum number of times that paid content (e.g., advertisements) can be displayed to users.

198.     On information and belief, the Alliance Data '139 product enables tabulating user interaction with paid content including the generating of sales and leads following clicking.  The below screenshot shows tracking based on lead generation and/or sales from user interactions with paid content.



*CJ Affiliate Advertisers*, CJ AFFILIATE MEMBERS WEBSITE, available at: https://members.cj.com/member/ (last visited February 12, 2016).

199.     On information and belief, the Alliance Data '139 Product enables receiving payment from advertisers (providers of paid content) for the number of interactions of users with the paid content (advertising).  Alliance Data documentation establishes that payments are received by CJ Affiliate from providers of paid content.  "The Payment Reconciliation pop-up displays your commission totals by advertiser, and displays the following information: Advertiser CID (Company ID), Advertiser Name, Month/Event Date (the month the event

---

[60] *CJ Affiliate Transaction Reports*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/1065/kw/current%20balance (last visited February 10, 2016).

occurred), Transaction Type and Amount.  The Amount is the total of all commissions earned from this advertiser for the specified time period and will display in your functional currency."[61]

200.    On information and belief, the Alliance Data '139 Product enables paying content providers for the number of interactions (e.g., leads generated or sales) of users with the paid content.  CJ Affiliate documentation from Alliance Data confirms that payments to publishers can be made by check, or direct deposit.  "CJ supports multiple check and direct deposit payment options for you to choose from depending on where you reside and the country where you have a banking institution.  At present time CJ does not offer payment to a publisher's PayPal account or into a credit card account, such as VISA or American Express."[62]

201.    On information and belief, Alliance Data has directly infringed and continues to directly infringe the '139 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, Alliance Data '139 Product, which includes infringing web content management technologies.

202.    By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to Alliance Data '139 Product, Alliance Data has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '139 patent, including at least claim 5, pursuant to 35 U.S.C. § 271(a).

203.    On information and belief, Alliance Data also indirectly infringes the '139 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

204.    On information and belief, Alliance Data has had knowledge of the '139 patent since at least service of this Complaint or shortly thereafter, and on information and belief,

---

[61] *Payment Status and History*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/602/kw/payment%20advertiser (last visited February 16, 2016).

[62] *Payment Options for Publishers*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/606/kw/payment%20publisher (last visited February 8, 2016).

Alliance Data knew of the '139 patent and knew of its infringement, including by way of this lawsuit.

205.    On information and belief, Alliance Data intended to induce patent infringement by third-party customers and users of the Alliance Data '139 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Alliance Data specifically intended and was aware that the normal and customary use of the accused products would infringe the '139 patent.  Alliance Data performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '139 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Alliance Data provides the Alliance Data '139 Product that has the capability of operating in a manner that infringe one or more of the claims of the '139 patent, including at least claim 5, and Alliance Data further provides documentation and training materials that cause customers and end users of the Alliance Data '139 Product to utilize the products in a manner that directly infringe one or more claims of the '139 patent.  By providing instruction and training to customers and end-users on how to use the Alliance Data '139 Product in a manner that directly infringes one or more claims of the '139 patent, including at least claim 5, Alliance Data specifically intended to induce infringement of the '139 patent. On information and belief, Alliance Data engaged in such inducement to promote the sales of the Alliance Data '139 Product, *e.g.,* through CJ Affiliate manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '139 patent.[63]  Accordingly, Alliance Data has induced and continues to induce users of the

---

[63] *Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf; *Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010); *CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2; *CJ Affiliate Account Manager Site*, (last visited January 5, 2016), available at: http://www.cj.com/publisher/cj-product-widgets; Hal Arnold, *Commission Junction Technology Stack: In Under 600 Words,* CJ BLOG (January 23, 2013), available at: http://blog.cj.com/01232013/commission-junction-technology-stack-under-600-word; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available

accused product to use the accused product in its ordinary and customary way to infringe the '139 patent, knowing that such use constitutes infringement of the '139 patent.

206.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '139 patent.

207.    As a result of Alliance Data's infringement of the '139 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Alliance Data's infringement, but in no event less than a reasonable royalty for the use made of the invention by Alliance Data together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Alliance Data's infringing activities are enjoined by this Court.

208.    Unless a permanent injunction is issued enjoining Alliance Data and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '139 patent, UnoWeb will be greatly and irreparably harmed.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 8,140,384

209.    UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

210.    Alliance Data makes, uses, sells, and/or offers for sale in the United States products and/or services for internet advertising revenue sharing.

211.    Alliance Data makes, sells, offers to sell, imports, and/or uses CJ Affiliate (the "Alliance Data '384 Product").

212.    On information and belief, the Alliance Data '384 Product includes internet advertising functionality.

---

at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api.

213.    On information and belief, the Alliance Data '384 Product is available to businesses and individuals throughout the United States.

214.    On information and belief, the Alliance Data '384 Product is provided to businesses and individuals located in the Eastern District of Texas.

215.    On information and belief, the Alliance Data '384 Product enables web site development based on advertising revenue sharing.

216.    On information and belief, the Alliance Data '384 Product displays paid content from an advertiser through a webpage on a web site.

217.    On information and belief, the Alliance Data '384 Product enables registering a content provider to provide non-paid content.  For example, the Alliance Data documentation states that "As a new publisher in the CJ Network, you will have to apply to individual advertiser programs before you can promote their products and services and start earning commissions. But before you can even start thinking about what advertiser affiliate programs to join, your website should be optimized with good content that will appeal to not only your website visitors, but the advertisers reviewing your application."[64]

218.    On information and belief, the Alliance Data '384 Product enables content providers to register to provide non-paid content.  The below screen shot shows the network profile of a user that is registering to provide non-paid content on the CJ Affiliate Network.

---

[64] *What Publishers Need to Join*, CJ AFFILIATE WEBSITE, *available at*: http://www.cj.com/publisher/join (last visited February 16, 2016).



*CJ Affiliate Network Profile*, CJ AFFILIATE MEMBER WEBSITE, *available at*:
https://members.cj.com/member/ (last visited February 14, 2016).

219.    On information and belief, the Alliance Data '384 Product hosts on the Alliance Data computers said third-party-supplied content.  Alliance Data reads third-party-supplied content and makes third-party supplied content available to users.

220.    On information and belief, the Alliance Data '384 Product enables totaling the number of interactions by users of paid content.  These interactions include making a purchase following clicking on an advertising link.  The below documentation from Alliance Data describes the tracking of user interactions with paid content.

Transaction Reports enable you to easily and reliably track all actions, commissions and financial transactions in order to better manage your programs and accounts.

Transaction Reports offer you a detailed view of your program's activity in reference to commission and action transactions (events such as a sale or a lead)

for specific advertisers.  You may use these reports to track revenue generated and spent, and analyze the financial results of your program.[65]

221.    On information and belief, the Alliance Data '384 Product enables the setting of a maximum number of times that paid content (e.g., advertisements) can be displayed to users.

222.    On information and belief, the Alliance Data '384 Product enables combining the free content with the paid content on a content page.

223.    On information and belief, the Alliance Data '384 Product enables tabulating user interaction with paid content including the generating of sales and leads following clicking.  The below screenshot shows tracking based on lead generation and/or sales from user interactions with paid content.



*CJ Affiliate Advertisers*, CJ AFFILIATE MEMBERS WEBSITE, available at: https://members.cj.com/member/ (last visited February 12, 2016).

224.    On information and belief, the Alliance Data '384 Product enables receiving payment from advertisers (providers of paid content) for the number of interactions of users with the paid content (advertising).  Alliance Data documentation establishes that payments are received by CJ Affiliate from providers of paid content.  "The Payment Reconciliation pop-up

---

[65] *CJ Affiliate Transaction Reports*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/1065/kw/current%20balance (last visited February 10, 2016).

displays your commission totals by advertiser, and displays the following information: Advertiser CID (Company ID), Advertiser Name, Month/Event Date (the month the event occurred), Transaction Type and Amount. The Amount is the total of all commissions earned from this advertiser for the specified time period and will display in your functional currency."[66]

225. On information and belief, the Alliance Data '384 Product enables paying content providers for the number of interactions (e.g., leads generated or sales) if users with the paid content. CJ Affiliate documentation from Alliance Data confirms that payments to publishers can be made by check, or direct deposit. "CJ supports multiple check and direct deposit payment options for you to choose from depending on where you reside and the country where you have a banking institution. At present time CJ does not offer payment to a publisher's PayPal account or into a credit card account, such as VISA or American Express."[67]

226. On information and belief, the Alliance Data '384 Product determines a net total of by subtracting from the gross total the number of subsequent times the user accesses the content page before expiration of a waiting-time threshold from an immediately preceding access.

227. On information and belief, Alliance Data has directly infringed and continues to directly infringe the '384 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, Alliance Data '384 Product, which includes infringing web content management technologies.

228. By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to Alliance Data '384 Product,

---

[66] *Payment Status and History*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/602/kw/payment%20advertiser (last visited February 16, 2016).

[67] *Payment Options for Publishers*, CJ AFFILIATE SUPPORT WEBSITE, *available at:* http://cjsupport.custhelp.com/app/answers/detail/a_id/606/kw/payment%20publisher (last visited February 8, 2016).

Alliance Data has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '384 patent, including at least claims 6 and 7, pursuant to 35 U.S.C. § 271(a).

229.    On information and belief, Alliance Data also indirectly infringes the '384 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

230.    On information and belief, Alliance Data has had knowledge of the '384 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Alliance Data knew of the '384 patent and knew of its infringement, including by way of this lawsuit.

231.    On information and belief, Alliance Data intended to induce patent infringement by third-party customers and users of the Alliance Data '384 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Alliance Data specifically intended and was aware that the normal and customary use of the accused products would infringe the '384 patent.  Alliance Data performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '384 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Alliance Data provides the Alliance Data '384 Product with the capability of operating in a manner that infringe one or more of the claims of the '384 patent, including at least claims 6 and 7, and Alliance Data further provides documentation and training materials that cause customers and end users of the Alliance Data '384 Product to utilize the product in a manner that directly infringe one or more claims of the '384 patent.  By providing instruction and training to customers and end-users on how to use the Alliance Data '384 Products in a manner that directly infringes one or more claims of the '384 patent, including at least claims 6 and 7, Alliance Data specifically intended to induce infringement of the '384 patent.  On information and belief, Alliance Data engaged in such inducement to promote the sales of the Alliance Data '384 Products, *e.g.,* through CJ Affiliate manuals, product support, marketing materials, and training materials to actively induce the users of the accused product to

infringe the '384 patent.[68]  Accordingly, Alliance Data has induced and continues to induce users of the accused product to use the accused product in their ordinary and customary way to infringe the '384 patent, knowing that such use constitutes infringement of the '384 patent.

232.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '384 patent.

233.   As a result of Alliance Data's infringement of the '384 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Alliance Data's infringement, but in no event less than a reasonable royalty for the use made of the invention by Alliance Data together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Alliance Data's infringing activities are enjoined by this Court.

234.   Unless a permanent injunction is issued enjoining Alliance Data and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '384 patent, UnoWeb will be greatly and irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UnoWeb respectfully requests that this Court enter the following prayer for relief:

A.   A judgment in favor of Plaintiff UnoWeb that Alliance Data has infringed, either literally and/or under the doctrine of equivalents, the

---

[68] *Product Data Feed Optimization*, CJ AFFILIATE DATA SHEET at 2 (last visited January 5, 2016), available at: http://www.se.cj.com/sites/default/files/pdfs/Product-Data-Feed-Optimization-web.pdf; *Data Transfer Guide Advertiser Product Data* V 6.0, COMMISSION JUNCTION GUIDE at 1 (November 2010); *CJ Affiliate Legal Compliance – Product Catalog Scanning* (last visited January 5, 2016), available at: http://www.cj.com/legal/product-catalog/scanning-2; *CJ Affiliate Account Manager Site*, (last visited January 5, 2016), available at: http://www.cj.com/publisher/cj-product-widgets; Hal Arnold, *Commission Junction Technology Stack: In Under 600 Words*, CJ BLOG (January 23, 2013), available at: http://blog.cj.com/01232013/commission-junction-technology-stack-under-600-word; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api; *CJ Affiliate Support Center – Product Catalog Search API* (last visited January 6, 2016), available at: http://cjsupport.custhelp.com/app/answers/detail/a_id/1698/kw/api.

'345 patent, the '386 patent, the '139 patent, and the '384 patent;

B.    An award of damages resulting from Alliance Data's acts of infringement in accordance with 35 U.S.C. § 284;

C.    A permanent injunction enjoining Alliance Data and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with Alliance Data, from infringing the '345 patent, the '386 patent, the '139 patent, and the '384 patent;

D.    A judgment and order requiring Alliance Data to provide accountings and to pay supplemental damages to UnoWeb including, without limitation, prejudgment and post-judgment interest; and

E.    Any and all other relief to which UnoWeb may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, UnoWeb requests a trial by jury of any issues so triable by right.

Dated:  February 23, 2016                    Respectfully submitted,


                                             /s/  Elizabeth L. DeRieux                    
                                             Elizabeth L. DeRieux (TX Bar No. 05770585)
                                             D. Jeffrey Rambin (TX Bar No. 00791478)
                                             CAPSHAW DERIEUX, LLP
                                             114 E. Commerce Ave.
                                             Gladewater, Texas 75647
                                             Telephone: 903-845-5770
                                             E-mail: ederieux@capshawlaw.com
                                             E-mail: jrambin@capshawlaw.com


                           OF COUNSEL:

                                   Dorian S. Berger (CA SB No. 264424)
                                   Daniel P. Hipskind (CA SB No. 266763)
                                   BERGER & HIPSKIND LLP
                                   1880 Century Park East, Suite 815
                                   Los Angeles, CA 90067
                                   Telephone: 213-516-7904
                                   Facsimile: 213-260-8629
                                   E-mail: dsb@bergerhipskind.com
                                   E-mail: dph@bergerhipskind.com


                                   Matt Olavi (CA SB No. 265945)
                                   Brian J. Dunne (CA SB No. 275689)
                                   OLAVI DUNNE LLP
                                   816 Congress Ave., Ste. 1620
                                   Austin, Texas 78701
                                   Telephone: 512-717-4485
                                   Facsimile: 512-717-4495
                                   E-mail: molavi@olavidunne.com
                                   E-mail: bdunne@olavidunne.com


                                   *Attorneys for UnoWeb Virtual, LLC*